FILED

2012 Oct-18  PM 02:44
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **FIRST METRO BANK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. CV-12-S-2217-NW** |
| | ) | |
| **CENTRAL BANK,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

First Metro Bank commenced this action on June 20, 2012, asserting a claim against Central Bank for failure to honor a letter of credit.[1]  The case currently is before the court on the following motions: (1) plaintiff's motion for an expedited pretrial conference;[2] (2) defendant's motion to dismiss for lack of personal jurisdiction or, alternatively, to stay the action pending the outcome of a parallel state court proceeding;[3] (3) plaintiff's motion for leave to file an amended complaint;[4] and (4) plaintiff's motion for summary judgment.[5]  Upon consideration of the pleadings, briefs, and evidentiary submission, the court concludes that the motion to dismiss for lack of personal jurisdiction should be granted, and all other motions should be

---

[1] *See* doc. no. 1 (Complaint).

[2] Doc. no. 7.

[3] Doc. no. 11.

[4] Doc. no. 30.

[5] Doc. no. 31.

denied as moot.

# I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b) provides, in pertinent part, that a party may assert by motion the defense of lack of personal jurisdiction.  Fed. R. Civ. P. 12(b)(2).  The plaintiff asserting jurisdiction over a non-resident defendant has the burden of establishing a *prima facie* case of personal jurisdiction, which can be done by producing enough evidence to withstand a motion for directed verdict.  *Stubbs v. Wyndham Nassau Resort and Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006) (citing *Meier ex rel. Meier v. Sun International Hotels, Ltd.*, 288 F.3d 1264, 1268-69 (11th Cir.2002)).  The court must accept all allegations of the plaintiff's complaint as true, except to the extent that the defendant presents evidence to contradict those allegations.  If that occurs, then the burden shifts back to plaintiff to "produce evidence supporting personal jurisdiction."  *Stubbs,* 447 F.3d at 1360. When the parties present conflicting evidence, the court must "construe all reasonable inferences in favor of the plaintiff."  *Id.*

# II. RELEVANT FACTS[6]

Plaintiff, First Metro Bank, is a bank organized, authorized, and chartered

---

[6] These facts have been taken from the allegations of plaintiff's complaint, as well as from the evidence submitted by the parties.  All reasonable inferences from the evidence have been construed in plaintiff's favor.

pursuant to the laws of the State of Alabama, and it maintains its principal place of business in Muscle Shoals, Alabama.[7]  Defendant, Central Bank, is a bank organized, authorized, and chartered pursuant to the laws of the State of Tennessee, and it maintains its principal place of business in Savannah, Tennessee.[8]  Central Bank has never been licensed or registered to conduct business in the State of Alabama, and it has never had any branch offices in Alabama.  Instead, all of Central Bank's three branches are located in Tennessee.[9]

Sometime during January of 2009, a customer named Charles Smith came to First Metro's office in Muscle Shoals, Alabama, to request a business loan in the amount of $1,500,000 for his company, Tennessee Materials,[10] which was located in Tennessee, incorporated in Tennessee, and had its principal place of business in Tennessee.[11]  Smith met with Greg Bowling, First Metro's Executive Vice President.[12]  Bowling stated in his affidavit that Smith maintained a residence in Natural Bridge, Alabama,[13] but Robert Adkisson, Central Bank's President and Chief Executive

---

[7] Complaint ¶ 1.

[8] *Id.* ¶ 2; doc. no. 12 (defendant's brief in support of motion to dismiss), Exhibit A (Affidavit of Woody Edward Jones) ¶¶ 1, 5.

[9] *Id.* ¶¶ 1, 6.

[10] Doc. no. 17 (Affidavit of Greg Bowling) ¶ 4.

[11] Adkisson Affidavit ¶ 2.

[12] Bowling Affidavit ¶¶ 2, 4.

[13] *Id.* ¶ 4.

3

Officer, stated that Smith's residence was in Tennessee.[14]   Smith had conducted business with First Metro in the past, although Bowling stated in his affidavit that he believed Smith's "primary banking relationship" was with Central Bank.[15]   In fact, Central Bank had previously issued letters of credit to secure a $300,000 loan that First Metro made to American Coal & Iron LLC, another of Smith's companies.[16] Bowling agreed to consider providing a $1,500,000 loan for Tennessee Materials, but only upon the condition that it, like First Metro's previous loan to American Coal & Iron, LLC, would be secured by a letter of credit from Central Bank.[17]

Soon thereafter, Bowling received a communication through an unspecified medium from Tennessee resident Chris Jerrolds, Central Bank's President and Chief Executive Officer, confirming that Central Bank had agreed to issue an irrevocable letter of credit in the full amount of the loan requested by Smith for Tennessee Materials.[18]   On January 8, 2009, Jerrolds sent a letter to Bowling's office in Alabama, stating that Central Bank had approved two letters of credit.  The first letter of credit was to secure an initial loan to Tennessee Materials in the amount of $100,000 to provide operating capital until the second, $1,500,000 loan could be

---

[14] Doc. no. 12, Exhibit B (Affidavit of Robert Adkisson) ¶ 2.

[15] Bowling Affidavit ¶ 4.

[16] *Id.*

[17] *Id.*

[18] *Id.* ¶ 5.

closed.[19]   After receiving the January 8 letter, Bowling spoke with Jerrolds by telephone on "one or more" occasions in January concerning Central Bank's agreement to provide letters of credit in the full amount of the loan.  Jerrolds orally confirmed that Central Bank had approved both letters of credit, and he also spoke highly of Smith, stating that he was one of Central Bank's best customers.[20]

On January 9, 2009, Jerrolds faxed Bowling some corporate information about Tennessee Materials and a draft letter of credit for the initial $100,000 portion of the loan.[21]  Jerrolds, on behalf of Central Bank, subsequently executed the letter of credit for the $100,000 portion of the loan and had it delivered, through unspecified means, to First Metro's office in Muscle Shoals, Alabama.[22]  In reliance upon that letter of credit, First Metro agreed to provide an initial operating loan to First Metro in the amount of $100,000, which would be paid off once the larger, $1,500,000 loan closed.[23]

On January 26, 2009, Jerrolds, on behalf of Central Bank, executed a letter of credit in the full amount of the $1,500,000 loan to Tennessee Materials and had that letter delivered, through unspecified means, to First Metro's office in Muscle Shoals,

---

[19] *Id.*

[20] *Id.*

[21] Bowling Affidavit ¶ 6.

[22] *Id.*

[23] *Id.*

5

Alabama.  In reliance upon that letter of credit, First Metro agreed to make the

$1,500,000 loan to Tennessee Materials.[24]

> The $1.5 Million loan to Tennessee Materials was for an original term of six months, but was subject to being renewed.  In or about July 2009, the Borrower requested a renewal of the loan, and to increase the loan amount to $2.2 Million.  This represented a sizeable increase of $700,000 in the loan amount, but Mr. Jerrolds provided assurances by telephone that Central had approved a letter of credit in the full amount of the $2.2 Million requested by Tennessee Materials.[25]

Bowling was in his office in Muscle Shoals, Alabama, when he had those telephone

conversations with Jerrolds.  Subsequently, on July 26, 2009, Jerrolds executed a

letter of credit on behalf of Central Bank in the full amount of the $2.2 Million

renewal of the loan to Tennessee Materials and had it delivered, through unspecified

means, to First Metro's offices in Muscle Shoals, Alabama.  The July 26 letter of

credit contained a mistake, so Jerrolds sent a replacement letter of credit to Bowling's

office in Muscle Shoals, Alabama, on July 31, 2009.  Based upon the July 31, 2009

letter of credit, First Metro agreed to renew the loan to Tennessee Materials, and to

increase the amount of the loan to $2.2 Million.[26]

First Metro's loan to Tennessee Materials again was due for renewal in July of

2010.  On July 15, 2010, Jerrolds executed another letter of credit on behalf of

---

[24] *Id.* ¶ 7.

[25] *Id.* ¶ 8.

[26] *Id.*

Central Bank for the full amount of First Metro's loan to Tennessee Materials. Based upon the July 15, 2010 letter of credit, First Metro agreed to renew the loan for a period of six months.[27]

The next renewal period for First Metro's loan to Tennessee Materials was in January of 2011. On January 20, 2011, Jerrolds placed a telephone call from Tennessee to Bowling's office in Alabama, and left a voice message stating that a letter of credit from Central Bank with regard to the loan renewal would be in the mail the next day. Indeed, on January 21, 2011, Jerrolds executed a letter of credit on behalf of Central Bank for the full amount of First Metro's loan to Tennessee Materials and transmitted a facsimile copy of that letter of credit to Bowling's office in Muscle Shoals, Alabama. Jerrolds also sent the original letter of credit to Bowling's office *via* regular mail. Based upon the January 21, 2011 letter of credit, First Metro agreed to renew its loan to Tennessee Materials for another period of six months.[28]

Sometime during July of 2011, First Metro decided not to renew the loan to Tennessee Materials, and sent notice to Jerrolds that it was exercising its right to draw on the letter of credit that Central Bank had issued to secure the loan. Upon receipt

---

[27] Bowling Affidavit ¶ 9.

[28] *Id.* ¶ 10.

7

of that notice, Jerrolds placed telephone calls and sent electronic mail communications to Bowlings at his office in Muscle Shoals, Alabama, to assure Bowlings that Tennessee Materials was on the verge of obtaining financing through a federal government program that could pay off its loan from First Metro.  Jerrolds suggested to Bowlings that First Metro should reconsider renewing the loan if Tennessee Materials could pay down the principal balance by $200,000.[29]  Jerrolds followed up on those communications in a July 19, 2011 letter addressed and delivered to Bowling's office in Muscle Shoals, Alabama.  In that letter, Jerrolds stated that Central Bank would "honor its letter of credit issued on behalf of Tennessee Materials Corp even if Tennessee Materials Corp files bankruptcy.  You will not have to wait through the normal legal process and we will honor it as agreed."[30]  Relying upon Jerrolds' representations, First Metro agreed to renew the loan to Tennessee Materials again, upon receipt of a $200,000 payment from Tennessee Materials to reduce the principal balance of the loan.  On July 26, 2011, Jerrolds executed a letter of credit on Central Bank's behalf for the full amount of the renewed loan, and had that letter delivered to First Metro's offices in Muscle Shoals, Alabama.[31]

---

[29] *Id.* ¶ 11.

[30] *Id.* ¶ 12 & Exhibit I.

[31] *Id.* ¶ 13.

8

The next renewal period was in October of 2011. On October 11, 2011, Jerrolds placed a telephone call to Bowling at his office in Muscle Shoals, Alabama, for the purpose of convincing First Metro to again renew the loan to Tennessee Materials. Jerrolds told Bowling that he had confirmed that Tennessee Materials had received the loan guarantee from the federal program, and that First Metro's loan to Tennessee Materials would be paid off as a result. Jerrolds also represented that the new lender would be contacting First Metro soon for payoff information. Based on those representations, First Metro agreed to renew the loan to Tennessee Materials for a period of four months.[32] There is no indication in the record that Tennessee Materials ever received any federal assistance, or that it made any payments to First Metro as a result of receiving assistance.

The final renewal period for the loan to Tennessee Materials was in February of 2012. On February 17, 2012, Jerrolds executed an irrevocable letter of credit on behalf of Central Bank in the amount of $1,783,660.44, and caused it to be delivered to First Metro's office in Muscle Shoals, Alabama.[33] The letter is on Central Bank letterhead and is addressed to the "Gentlemen" at First Metro Bank. The letter states:

> We have as of February 17, 2012 issued this Irrevocable Letter of
> Credit in your favor available by your drafts drawn on Central Bank,

---

[32] *Id.* ¶ 14.

[33] Bowling Affidavit ¶ 15.

9

485 Wayne Road (P.O. Box 1207), Savannah, Tennessee 38372 at sight, for any sum not exceeding the total of $1,783,660.44 for the account of Tennessee Materials Corp.  The drafts must be accompanied by your signed statement certifying copies of unpaid statement of account detailing balance due and statement of Tennessee Materials Corp. that the charges are due and unpaid from February 17, 2012.

This letter of credit expires on August 17, 2012, but will automatically extend without amendment for six months from the expiration date, or any future expiration date unless ten (10) days prior to such expiration date we notify you by registered mail that this letter of credit will not be renewed.  Upon receipt by you of such notice you may draw on us hereunder by means of your draft at sight for the full amount of [the] letter of credit.

Each draft must bear on its face the clause "Drawn under Irrevocable Letter of Credit No. 96412 dated February 17, 2012."

This Irrevocable Letter of Credit is not assignable and replaces any prior Letters of Credit.[34]

The letter was signed by Chris Jerrolds as President and CEO of Central Bank.[35]

In reliance upon the foregoing, February 17 letter of credit, First Metro decided to renew its loan to Tennessee Materials for a period of six months.  When Bowling made that decision on First Metro's behalf, he did not suspect that Jerrolds lacked authority to issue the letter of credit on Central's behalf.[36]  Additionally, Bowling stated the following in his affidavit:

---

[34] Complaint, at Exhibit A (February 17, 2012 letter of credit) (alteration supplied).

[35] *Id.*

[36] Bowling Affidavit ¶ 15.

10

16.     First Metro would never have agreed to make the loan were it not for the assurances I received from Mr. Jerrolds, a fellow banker, concerning the character, experience and financial standing of Charles Smith, and Central's agreement to issue an irrevocable letter of credit in favor of First Metro to secure the loan.  In accepting the irrevocable letter of credit and agreeing to make and repeatedly renew the loan, I relied both on Mr. Jerrolds' representation that Central had approved the irrevocable letter of credit and upon his actual, inherent or apparent authority as President and Chief Executive Officer of Central to issue the irrevocable letter of credit.

17.     Without the representations and promises that Mr. Jerrolds made on behalf of Central, and without Central's agreement to secure the loan with an irrevocable letter of credit, First Metro would not have made the loan initially, and would not have agreed to renew the loan thereafter.[37]

Tennessee Materials defaulted on its repayment obligations under the loan, and First Metro consequently presented two sight drafts, dated May 14 and May 24, 2012, to Central Bank pursuant to the February 17, 2012 letter of credit.[38]  Central Bank responded to First Metro's May 14 demand by a letter dated May 22, 2012, and sent by Central Bank's attorney to First Metro's office in Muscle Shoals, Alabama.  In that letter, Central Bank states that it refused to honor the "purported Letter of Credit" for several reasons, including that Central Bank never authorized the letter of credit, that honoring the demand would cause a "material fraud" on Central Bank, and that First

---

[37] *Id.* ¶¶ 16-17.

[38] *Id.* ¶ 18; *see also* Complaint, at Exhibits B & D.

Metro had notice of that fraud and participated in it.[39]  Central Bank never responded to First Metro's May 24, 2012 demand letter,[40] and it has not made any payment to First Metro under the February 17, 2012 letter of credit.[41]  Bowling stated in his affidavit that First Metro had no knowledge that the letters of credit issued by Central Bank might be invalid or unauthorized, and that First Metro never would have made or renewed the loan to Tennessee Materials if it had any reason to question the letters of credit.[42]

Woody Edward Jones, Central Bank's Executive Vice President and Chief Financial Officer, stated the following in his affidavit:

> Based on my review of the records of Central Bank, Central Bank did not solicit First Metro Bank in relation to the letter of credit that is at issue in this lawsuit.  So far as can be determined from Central Bank's records, that letter of credit arose from dealings in Tennessee between the former President of Central Bank, Chris Jerrolds, on the one hand, and the principal owner of Tennessee Materials Corp., Charles Smith, on the other hand.  Based on my review of the records of Central Bank, no one from Central Bank traveled to the State of Alabama in connection with the letter of credit.[43]

In another statement that was "based on [his] review of the records of Central Bank," Jones stated that "the series of purported letters of credit that are the subject matter

---

[39] Bowling Affidavit ¶ 18; *see also* Complaint, at Exhibit C.

[40] Bowling Affidavit ¶ 19.

[41] *Id.* ¶ 20.

[42] *Id.* ¶ 21.

[43] *Id.* ¶ 8.

of the litigation were not carried on the books of Central Bank."[44]  The purported letters of credit also were not reported to the Bank's Board of Directors.  Indeed, defendants's records reveal that "efforts were made to withhold the existence of those purported letters of credit from the Board of Directors of Central Bank."[45]  All of the omissions from Central Bank's records and all failures to disclose information occurred in Tennessee.[46]

Central Bank conducted an investigation into Jerrolds' actions with regard to the First Metro letters of credit, and Jerrolds' employment eventually was terminated. Central Bank reviewed approximately ten thousand electronic mail communications in conjunction with that investigation.  Central Bank also reviewed "voluminous" bank records and interviewed bank employees.  All of the records and employees were located in Tennessee.[47]

On May 25, 2012, Central Bank filed a complaint against Chris Jerrolds, First Metro Bank, and Wilburn Quarries, LLC, in the Chancery Court for Hardin County, Tennessee ("the state court lawsuit" or "the state court complaint").  In that complaint, Central Bank challenges the letters of credit Central Bank issued to First

---

[44] *Id.* ¶ 11 (alteration supplied).

[45] *Id.*

[46] Bowling Affidavit ¶ 11.

[47] *Id.* ¶ 10; *see also* Adkisson Affidavit ¶ 1.

Metro on behalf of Tennessee Materials, as well as another letter of credit Central

Bank issued to Wilburn Quarries, LLC.[48]  Central Bank alleges that the letter of credit

issued by Central Bank to First Metro was "unusually large and not in the ordinary

course of business between community banks of the size of Central Bank and First

Metro."[49]  Additionally,

> [b]efore Jerrolds issued the First Metro Purported Letter of Credit,
> Central Bank had presented for payment several checks (in large
> amounts) written on accounts at First Metro by entities owned and/or
> controlled by Charles R. Smith ("First Metro Checks").  First Metro
> returned those checks because of insufficient funds in the accounts of
> the Charles R. Smith related entity, and/or because the account had been
> closed.  Given normal banking practices at First Metro, First Metro had
> notice or should have had notice of existing or potential financial
> difficulties for Charles R. Smith and entities owned or controlled by
> him, like . . . Tennessee Materials.[50]

Central Bank further alleged in the state court complaint that "Jerrolds and

Charles R. Smith appeared to have a closer and more involved relationship than

customary between a banker and a customer.  Their close relationship was generally

known including (on information and belief) by . . . First Metro . . . ."[51]  Despite the

---

[48] The Wilburn Quarries letter of credit is not relevant to the instant case, so none of the
allegations from the state court lawsuit that relate to the Wilborn Quarries letter of credit will be
discussed in this opinion.

[49] Doc. no. 12 (defendant's brief in support of motion to dismiss), Exhibit 3 (Complaint in
*Central Bank v. Chris Jerrolds et al.,* No. CH-105 in the Chancery Court for Hardin County,
Tennessee) ("State Court Complaint") ¶ 10.

[50] *Id.* ¶ 11 (alterations supplied).

[51] *Id.* ¶ 15.

fact that all of the letters of credit issued by Central Bank were signed by Jerrolds, its

President and CEO, Central Bank alleges that the letters of credit were not

> occasioned by the requirements for corporate action by Central Bank.
> They were done entirely outside of the typical Central Bank procedures
> without notice or knowledge of . . . Central Bank; they were not placed
> on the books of . . . Central Bank as an obligation or otherwise; they
> were not reviewed by any committees or exposed to any other oversight
> of . . . Central Bank as would be the case of such an obligation; they
> were beyond Jerrolds' authority/ they were above and beyond the
> permitted lending limits to . . . Tennessee Materials; they were hidden
> by Jerrolds from regulatory oversight and audit review; and they were
> done in secret and were shielded from the usual and customary practices
> of Central Bank.[52]

Thus, Central Bank alleges that the letters of credit "were issued by Jerrolds under

such circumstances as should have and, upon information and belief, did place First

Metro . . . on notice that those letters of credit were not properly issued."[53]

Central Bank asserts in the state court complaint that it has valid defenses to

payment on the letters of credit, including fraud, lack of good faith, lack of

consideration, violation of warranties, waiver and estoppel, defects in First Metro's

demand letters, and Jerrolds' lack of authority.[54]  Central Bank asserts claims against

Jerrolds for negligence, wilfulness, fraud, and breach of fiduciary duty.[55]  Central

---

[52] *Id.* ¶ 16.

[53] *Id.* ¶ 17.

[54] *Id.* ¶¶ 20-26.

[55] State Court Complaint ¶¶ 28-34.

Bank also seeks a judgment "declaring and determining the respective rights of the parties as to the First Metro . . . Purported Letters of Credit and further for declaration that Central Bank shall have no further obligation as to the First Metro . . . Purported Letters of Credit."[56]

In the present lawsuit, First Metro claims that "Central Bank's dishonor of the Letter of Credit is wrongful and in breach of its obligations under the Letter of Credit and in violation of law."[57]  First Metro claims that, as a result of Central Bank's wrongful dishonor, it has suffered damage in the amount of $1,783,660.44, plus interest, costs, and attorney fees.[58]

### III. DISCUSSION

Alabama's long-arm statute authorizes the exercise of personal jurisdiction to the fullest extent allowed by the United States Constitution; therefore, the traditional two-step personal jurisdiction inquiry of assessing the propriety of jurisdiction under the forum state's long-arm statute, and then determining whether the exercise of jurisdiction would violate the Due Process Clause of the Fourteenth Amendment, collapses into a single step in Alabama.  *See*, *e.g.*, *Sloss Industries Corp. v. Eurisol*, 488 F.3d 922, 925 (11th Cir. 2007) (observing that in Alabama, "the two inquiries

---

[56] *Id.* ¶¶ 35-36.

[57] Complaint ¶ 14.

[58] *Id.* ¶ 15.

16

merge, because Alabama's long-arm statute permits the exercise of personal jurisdiction to the fullest extent constitutionally permissible"); *Matthews v. Brookstone Stores, Inc.*, 469 F. Supp. 2d 1056, 1060 (S.D. Ala. 2007) ("In Alabama, this two-pronged inquiry collapses into a single question because Alabama's long-arm provision permits its courts to exercise personal jurisdiction to the full extent permitted by the Due Process Clause of the Fourteenth Amendment."); *see also Ex parte Unitrin, Inc.*, 920 So. 2d 557, 560 (Ala. 2005) ("Jurisdiction is obtained over out-of-state defendants pursuant to the 'long-arm' rule, Ala. R. Civ. P. 4.2(a)(2)(A)-(I).").

Due process authorizes the exercise of personal jurisdiction over a nonresident defendant when "(1) the nonresident defendant has purposefully established minimum contacts with the forum; and (2) the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice." *S.E.C. v. Carrillo*, 115 F.3d 1540, 1542 (11th Cir. 1997) (citation omitted); *see also Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*, 421 F.3d 1162, 1166 (11th Cir. 2005) (same).

"Furthermore, it is important to remember that *the conduct at issue is that of the defendants*.  No plaintiff can establish jurisdiction over a defendant through his own actions." *Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1356 (11th Cir. 2000) (emphasis supplied) (citing *Hanson v. Denckla*, 357 U.S. 235,

253 (1958)).  Therefore, this court must determine what, if anything, the defendant, Central Bank, did "to purposefully avail [itself] of the benefits of doing business in Alabama such that the notions of reasonableness and fairness are not offended by requiring [it] to defend [itself] in an Alabama court."  *Id.* (alterations supplied).

First Metro does not appear to assert that there is "general" jurisdiction over Central Bank in this court.  Instead, First Metro asserts that this court's jurisdiction over Central Bank is "specific" to this case.  "Specific jurisdiction arises out of a party's activities in the forum that are related to the cause of action alleged in the complaint." *McGow v. McCurry*, 412 F.3d 1207, 1214 n.3 (11th Cir. 2005) (citation omitted), *abrogated on state law grounds as stated in Diamond Crystal Brands, Inc. v. Food Movers International, Inc.,* 593 F.3d 1249 (11th Cir. 2010).  The exercise of personal jurisdiction on a specific jurisdiction theory is proper where a defendant's contacts with the forum state satisfy *all* of the following criteria:  (1) they are related to, or give rise to, the plaintiff's cause of action; and (2) they involve some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum; and (3) the defendant's contacts with the forum are such that the defendant should reasonably anticipate being haled into court there.  *See, e.g., Sloss*, 488 F.3d at 925; *McGow*, 412 F.3d at 1214; *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1546 (11th Cir. 1993).  That said, the court recognizes that a minimum

18

contacts analysis is "immune to solution by checklist," and that such contacts must be viewed both quantitatively and qualitatively. *Sloss*, 488 F.3d at 925.

It cannot reasonably be disputed that whatever contacts Central Bank had with the State of Alabama are related to, or gave rise to, the claims asserted by First Metro in this action. Additionally, with regard to the other aspects of the personal jurisdiction analysis, First Metro made the following allegations in its complaint:

> This Court has personal jurisdiction over Central Bank because it purposefully availed itself of the benefits and obligations of the forum, making jurisdiction consistent with traditional notions of fair play and substantial justice, including, without limitation, by: (1) contacting First Metro Bank in this judicial district in Alabama, including sending communications into the forum for the purpose of causing First Metro Bank to accept the letter of credit that is the subject of the dispute, (2) upon information and belief, transacting business within this state and/or with citizens of Alabama, and (3) causing injury or damage within this state.[59]

In its brief in response to Central Bank's motion to dismiss, First Metro asserts that "the actions Jerrolds took in his official capacity as Central's President and Chief Executive Officer subject Central to specific personal jurisdiction in this Court."[60] Specifically, First Metro asserts that Jerrolds's communications with First Metro over the course of three years — including contacting First Metro at its offices in Alabama, directing multiple written and telephonic communications to those offices for the

---

[59] *Id.* ¶ 4.

[60] Doc. no. 16, at 8.

purpose of persuading First Metro to issue the loan to Tennessee Materials, issuing a letter of credit to First Metro in Alabama, and repeatedly renewing that letter of credit — constitute constitutionally significant "minimum contacts" with the State of Alabama, and that all of those contacts are related to the claims asserted in First Metro's complaint.

Central Bank counters that it does not have sufficient contacts with the State of Alabama because "the activities that gave rise to First Metro's claim for wrongful dishonor primarily occurred in Tennessee."[61]  Specifically, Central Bank asserts that Jerrolds was in Tennessee when he conducted all communications with First Metro, that Jerrolds issued the letters of credit from Tennessee on the account of a Tennessee client, that neither Jerrolds nor any other Central Bank representative ever traveled to Alabama in connection with the letters of credit, that First Metro attempted payment on the letters of credit in Tennessee, that Central Bank made the decision not to honor the letters of credit from its Tennessee office, and that Tennessee Materials, not Central Bank, approached First Metro to initiate the process that eventually led to this action.

Central Bank also cites the Eleventh Circuit's decision in *Jet Charter Service, Inc. v. Koeck,* 907 F.2d 1110 (11th Cir. 1990), to support its assertion that its issuance

_____

[61] Doc. no. 12, at 14.

20

of a letter of credit to First Metro in Alabama is not sufficient to justify the exercise of personal jurisdiction in Alabama.  In that case, Jet Charter contracted to sell two aircraft to Progress Aviation ("Progress"), a Swiss Corporation.  *Id.* at 1111.  As part of the sales agreement, Progress was required to open a letter of credit in favor of Jet Charter to secure Progress's payments to Jet Charter, so Progress made arrangements to obtain such a letter from Paribas, a Swiss Bank.  *Id.*  A representative of Paribas attended the closing of the transaction in Miami, Florida, and he presented letters of credit pursuant to the sales agreement.  *Id.*  Jet Charter was dissatisfied with those letters, however, and it asserted a claim against Paribas for breach of contract for "failing to deliver the letter of credit by the stated deadline, and by delivering a letter that did not conform to the terms of the purchase agreement or the terms of the letter contract."  *Id.* at 1112.  Paribas moved to dismiss Jet Charter's complaint for lack of personal jurisdiction, and the district court granted that motion.  *Id.* at 1111.

The Eleventh Circuit affirmed on appeal, noting that "[t]he existence of a contractual relationship between a nonresident defendant and a Florida resident is not sufficient in itself to meet the requirements of due process."  *Id.* at 1113 (alteration supplied).  Neither were the following actions:

> Paribas agreed to provide a letter of credit in favor of Jet Charter, a Florida entity, which was an essential part of the aircraft sales transaction.  Furthermore, Paribas's bank officer, Caillet, accompanied

21

Progress when Progress first met with D'La Rotta in Miami to propose the sale of the aircraft, and Caillet provided D'La Rotta with a copy of a letter confirming that Paribas had committed to lending Progress the necessary funds for the purchase of the aircraft. When D'La Rotta and his wife subsequently traveled to Geneva, Caillet took them to lunch, and Caillet was present on behalf of Paribas at the closing of the sale in Miami, Florida. Paribas also agreed in the letter assurances given at the closing to deliver the letter of credit to Miami, Florida.

*Id.* The Eleventh Circuit's primary consideration in finding these contacts to be insufficient to establish personal jurisdiction was that all of Paribas's contacts with the State of Florida were initiated at the request of its Swiss customer, not at the request of a Florida resident. In other words, Paribas's only long-term contractual relationship was with its Swiss customer, not with Jet Charter or any other Florida resident. Moreover, even though Paribas's representative twice traveled to Florida in connection with the transaction, his visits were not "essential to Paribas's involvement in the transaction," because Paribas could have opened the letter of credit, and provided confirmation of its opening, from its office in Geneva. *Id.* at 1113-14.

The *Jet Charter* opinion also relied heavily on the decision of the Tenth Circuit in *Leney v. Plum Grove Bank,* 670 F.2d 878, 881 (10th Cir. 1982). There, an Illinois bank issued a letter of credit at the request of its Illinois customer to an attorney in Colorado who represented a third party who resided in California. The California

22

resident presented the letter of credit to his bank in California, which submitted it to the Illinois bank for payment.  The California resident sued in a federal district court in Colorado after the Illinois bank twice refused to make payment, asserting that the California resident's requests for payment did not comply with the requirements of the letter of credit.  *Id.* at 879.  On appeal, the Tenth Circuit held that the case should have been dismissed for lack of personal jurisdiction because

> The Illinois bank's nexus with Colorado was very limited.  The Bank's only place of business was in Illinois, and it was not authorized to do business, did no business, and had no agents or employees in Colorado.  The Bank issued the letter of credit in Illinois for an Illinois customer and resident.  The Illinois customer apparently had some relationship, undisclosed in the record, to the Colorado corporate purchaser.  The letter was payable to Leney, a California resident, "upon presentation to the [Illinois] Bank."

*Id.* at 880 (alteration supplied).  The Court acknowledged that the Illinois bank mailed the letter of credit to an attorney in Colorado, and that it may also have known that the letter would be used in the sale of property in Colorado, but those connections to the forum state, standing alone, were insufficient.  *Id.* at 880-81.  The Tenth Circuit based its decision partly on the nature and function of a letter of credit under the Uniform Commercial Code, stating:

> Additionally, we believe it is unfair to burden an issuing bank with having to defend litigation over a letter of credit in any state in which the bank could reasonably expect the credit to be used.  A letter of credit is "an engagement by a bank or other person made at the

request of a customer . . . that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit." U.C.C. § 5-103. By issuing the letter of credit the bank substitutes its credit for that of its customer. "The bank's obligation under the letter of credit is independent of the underlying sales contract. If the presented documents comply with the terms of the letter of credit, the bank is obligated to pay regardless of whether the goods themselves conform to the contractual terms." *H. Ray Baker, Inc. v. Associated Banking Corp.*, 592 F.2d 550, 553 (9th Cir.), *cert. denied*, 444 U.S. 832, 100 S. Ct. 63, 62 L. Ed. 2d 42 (1979).

So viewed the letter of credit is closely akin to a cashier's check or other negotiable instrument issued by a bank. *See* U.C.C. § 5-114. The most important parties are the bank and its customer on whose behalf the letter of credit is issued. To be paid, the beneficiary — like the payee of a cashier's check — need only be properly identified and comply with the conditions stated in the letter of credit. Probably every bank in the United States issues letters of credit to serve its customers. They are used by bank customers to buy goods in every state and all over the world. If we were to hold that jurisdiction is proper in Colorado on the facts of the instant case we would have to subject any bank that issues a letter of credit to suit in any state in which the bank could expect the credit to be used to buy goods or real estate.

*Id.* at 881.

As the Eighth Circuit stated in *Moog World Trade Corp. v. Bancomer, S.A.,* 90

F.3d 1382 (8th Cir. 1996),

other federal courts have been virtually unanimous in holding that a bank issuing a commercial letter of credit at the request of its customer, payable at the bank's offices, does not without more subject itself to personal jurisdiction in a distant forum, such as a court where the letter of credit beneficiary resides.

*Id.* at 1386 (citing *Pacific Reliant Industries v. Amerika Samoa Bank,* 901 F.2d 735,

24

737 (9th Cir. 1990); *Chandler v. Barclays Bank PLC,* 898 F.2d 1148, 1151 (6th Cir.

1990); *Leney,* 670 F.2d at 880; *H. Ray Baker, Inc. v. Associated Banking Corp.,* 592

F.2d 550, 552-53 (9th Cir. 1979); *Empire Abrasive Equipment Corp. v. H.H. Watson,*

*Inc.,* 567 F.2d 554, 558 (3d Cir. 1977); *Occidental Fire & Casualty Co. v.*

*Continental Illinois National Bank,* 689 F. Supp. 564 (E.D. N.C. 1988); *Southern*

*Plastics Co. v. Southern Commerce Bank,* 423 S.E. 2d 128, 132 (S.C. 1992))*.*

First Metro appears to acknowledge that, based on these cases, personal

jurisdiction over Central Bank could not be based on its issuance of a letter of credit

to First Metro on behalf of Tennessee Materials.[62]  Even so, First Metro makes two

alternative arguments for the assertion of jurisdiction.

First, First Metro asserts that this case does not involve a "singular isolated

banking transaction by a distant bank that had no reason to anticipate being haled into

court in Alabama.  Rather, the [letter of credit] represents the seventh renewal of a

lending relationship that spanned more than three years."[63]  It must be pointed out,

---

[62] *See* doc. no. 16, at 10 (characterizing *Jet Charter* and *Leney* as standing for "the unremarkable proposition that the mere issuance of a letter of credit in favor of an out-of-state beneficiary does not, by itself, subject the issuing bank to personal jurisdiction in a distant state where the credit might be used").  Indeed, this court sees no meaningful way to distinguish *Jet Charter, Laney,* or any of the similar cases from other Circuits. Here, Smith, not Central Bank, was the one who first approached First Metro about the loan that ultimately necessitated the issuance of letter of credit.  Moreover, Central Bank issued to the letter of credit to First Metro on behalf of Tennessee Materials, a *Tennessee* company.

[63] Doc. no. 16, at 8 (alteration supplied).

however, that the "lending relationship" to which First Metro refers was between First Metro and Tennessee Materials, not between First Metro and Central Bank.[64] The only relationship between First Metro and Central Bank arose out of Central Bank's issuance of the letter of credit, an action that was initiated by Smith on behalf of Tennessee Materials, not by Central Bank. This court sees no reason to assign more significance in the personal jurisdiction analysis to the *renewal* of a letter of credit than to *issuance* of such a letter, even if the letter of credit was renewed several times. Indeed, several of the cases holding that the issuance of a letter of credit is insufficient to establish personal jurisdiction involved multiple letters of credit. *See, e.g., Moog,* 90 F.3d at 1384, 1386 (during the two years immediately preceding the action, the defendant bank had issued four prior letters of credit to the same beneficiary, and on behalf of the same client, that were involved in the *Moog* decision); *Occidental Fire & Casualty Co.,* 689 F. Supp. at 568 (issuance and subsequent denial of seven letters of credit did not subject the issuing bank to personal jurisdiction in another state). Consequently, if the issuance of a letter of credit is insufficient to establish personal jurisdiction, then the renewal of a letter of

---

[64] First Metro also suggests that the fact that Central Bank is located in Southern Tennessee, not far from the Alabama state line, should figure into the "minimum contacts" analysis. While that fact might have some relevance, especially to the second prong of the due process analysis — *i.e.,* whether the exercise of jurisdiction in the forum state will offend traditional notions of fair play and substantial justice — First Metro has not cited any authority to suggest that the proximity of the two banks across state lines should figure heavily into the first prong of the analysis.

credit also should be insufficient.  Moreover, Central Bank's contacts with the State of Alabama are no more significant than the contacts Paribas had with the State of Florida in the *Jet Charter* case, even though Central Bank's contacts with Alabama may have extended over a longer period of time.  In *Jet Charter,* a Paribas employee traveled to Florida on more than one occasion in connection with Paribas's issuance of a letter of credit.  Here, in contrast, no employee of Central Bank ever traveled to Alabama for a matter related to the letter of credit.

Secondly, according to First Metro, "this case does not involve the mere issuance of a letter of credit."[65]  Instead, First Metro asserts that this case is about Jerrolds, who, acting on behalf of Central Bank, perpetrated a fraud on First Metro, an Alabama resident.  According to First Metro, Jerrolds's commission of fraud, an intentional tort, is sufficient to warrant the exercise of personal jurisdiction over Central Bank.  First Metro relies upon the Eleventh Circuit's decision in *Licciardello v. Lovelady,* 544 F.3d 1280 (11th Cir. 2008).  There, the Eleventh Circuit held that intentional torts expressly aimed at the forum state "may support the exercise of personal jurisdiction over the nonresident defendant who has no other contacts with the forum."  *Id.* at 1285 (citing *Calder v. Jones,* 465 U.S. 783, 790 (1984)).

The problem with that argument is that First Metro's complaint cannot fairly

---

[65] Doc. no. 16, at 8.

be construed as asserting a claim for fraud or any other intentional tort. Instead, the complaint is based on Central Bank's alleged breach of its obligations in the letter of credit.[66] The vehicle described in *Licciardello* and *Calder* for extending personal jurisdiction to non-resident defendants only applies in cases that involve claims for intentional torts. *See, e.g., Licciardello*, 544 F.3d at 1286 ("Many courts have employed the *Calder* 'effects' test when the plaintiff's claim involves an intentional tort."); *id.* ("[T]he Ninth Circuit has recognized that the defendant's connection with the forum in an intentional tort case should be evaluated under the *Calder* 'effects' test, rather than the contracts-oriented 'minimum contacts' test.") (citing *Ziegler v. Indian River County*, 64 F.3d 470, 473 (9th Cir. 1995) (alteration supplied)); *id.* at 1286 n.6 ("Mere negligent use of an infringing mark would not satisfy the *Calder*

---

[66] *See* Complaint ¶ 14 ("Central Bank's dishonor of the Letter of Credit is wrongful and in breach of its obligations under the Letter of Credit and in violation of law.").

First Metro also appears to suggest that it is irrelevant that it did not assert a claim for fraud, because it was Central that first raised the issue of Jerrolds' fraud to support its argument that it should not be subject to personal jurisdiction in Alabama for Jerrolds' actions. *See* doc. no. 28 (First Metro's surreply in opposition to motion to dismiss or stay), at 4 n.3 ("Central misunderstands First Metro's Argument about the alleged fraud of Mr. Jerrolds. It was Central who alleged that its own President and Chief Executive Officer was engaged in an act of fraud. It is thus appropriate for the Court to consider such allegations of fraud — directed at an Alabama bank — in deciding Central's motion."). It may indeed be appropriate for the court to consider those allegations to *some* extent, but First Metro has cited no authority, and the court knows of none, to support the proposition that the *Calder* "effects" test applies to the personal jurisdiction analysis anytime allegations of intentionally tortious behavior are mentioned in a lawsuit, especially when the lawsuit itself clearly is based upon a breach of contract claim.

test.").[67]

In summary, the court finds that First Metro has failed to satisfy its burden of demonstrating that Central Bank's contacts with the State of Alabama related to plaintiff's claims in this case are constitutionally significant, such that the exercise of jurisdiction over Central Bank in this court would not offend principles of due process. Because Central does not have sufficient "minimum contacts" to warrant the exercise of jurisdiction in Alabama, the court need not reach the second step of the due process analysis, *i.e.,* whether the exercise of jurisdiction will offend traditional notions of fair play and substantial justice.

## IV. CONCLUSION AND ORDERS

In accordance with the foregoing, Central Bank's motion to dismiss for lack of jurisdiction is GRANTED, and it is ORDERED that all claims in this case are DISMISSED, but without prejudice to First Metro's right to refile those claims in a court with proper jurisdiction. Because Central Bank's motion is due to be granted on those grounds, the court need not discuss the alternative aspect of that motion, seeking a stay of this case pending the outcome of a parallel state court proceeding.

---

[67] The parties also make a substantial issue of whether Jerrolds exceeded his authority when he executed the letters of credit. Central Bank asserts that, if Jerrolds was acting outside the scope of his authority, then it cannot be held liable for its actions. It is not necessary for the court to resolve that issue, however, because, even assuming Jerrolds was acting within his authority as an agent of Central Bank, there still are not sufficient contacts to warrant the exercise of jurisdiction over Central Bank in this state.

All of the pending motions filed by First Metro, including its motion for expedited pretrial conference, its motion for leave to file an amended complaint, and its motion for summary judgment, are DENIED as moot.

Costs incurred herein are taxed to plaintiff.  The Clerk is directed to close this file.

**DONE** this 18th day of October, 2012.

United States District Judge